FILED
2023 Jun-12  AM 10:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

**ROBERT EDWARD TAYLOR,
JR.,** *as the Personal Representative
and Administrator of the Personal
Estate of Brett Verdun Taylor,*
     Plaintiff,

**v.**

**ERIC STARR, et al.,**
     Defendants.

**Case No. 1:20-cv-489-CLM**

## <u>MEMORANDUM OPINION</u>

Brett Taylor died of methamphetamine toxicity while being detained at the Calhoun County Jail on a public intoxication charge. Taylor's estate sues several law enforcement officials and healthcare providers at the Jail, asserting claims of deliberate indifference to serious medical needs, negligence, wantonness, and vicarious liability. The healthcare provider defendants (Southern Health Partners, Inc., Maggen Cranford, Hadassah Underwood, Heather Clay, and Brent Cobb) move for summary judgment on the deliberate indifference to serious medical needs claim. (Doc. 107). The law enforcement defendants (Eric Starr, Jordan Luker, Nicholas Perry, Justin Graham, Travis Thornton, Dalton Summers, Cayson Hall, Kiemaurrie Johnson, and Joshua Blair) move for summary judgment on the deliberate indifference claims as well as the state-law claims of negligence and wantonness. (Doc. 102).

For the reasons stated within, the court will **GRANT** the healthcare provider defendants' motion for partial summary judgment (doc. 107) and **GRANT IN PART** the law enforcement defendants' motion for summary judgment (doc. 102). The court will **DISMISS WITH PREJUDICE** the deliberate indifference to serious medical needs claims brought under 42 U.S.C. § 1983. The court will decline to continue to exercise supplemental jurisdiction over the state-law claims and **DISMISS** those claims **WITHOUT PREJUDICE** under 28 U.S.C. § 1367(c).

## STATEMENT OF THE FACTS

### A.    Arrest & Booking

Between 5:00 and 5:30 AM on July 12, 2018, Anniston Police Officer Ryan Nolan responded to a call about a man slapping the glass of the office window at an American Inn. Nolan found Brett Taylor in the parking lot. Taylor appeared to be under the influence of an unknown substance, and he had a burn mark on his lip consistent with use of a pipe. Taylor was also talking gibberish, claimed he was thirsty, and had a white film on his lips. Nolan arrested Taylor for public intoxication and took him to the Calhoun County Jail. Taylor couldn't sit still in the patrol car but otherwise didn't give Nolan any trouble.

Video footage from the Jail's sallyport shows Nolan pulling into the sallyport around 5:36 AM and removing Taylor, who is shirtless, from his vehicle. Nolan kept his hand on Taylor as he walked Taylor into the Jail because Taylor was walking in a zig-zag fashion. Kiemaurrie Johnson was a second shift corporal who was working the booking desk when Nolan arrived with Taylor. Because Taylor was presumably under the influence of narcotics, Nolan asked Johnson to accompany him and Taylor from the sallyport to booking. Video from the booking area shows that Taylor kept fidgeting and would not stand still. Because Taylor was incoherent, he was not placed in the holding area with other inmates. He was instead placed in the attorney room by Nolan, Johnson, and Joshua Blair around 5:40 AM.

When Jordan Luker, the day shift supervisor, arrived at the Jail, Taylor was already booked and housed in the attorney room. Another officer informed Luker that Taylor was in the attorney room because he was acting strange and aggressive. Around 8:00 AM, Luker observed Taylor in the attorney room. Taylor was making guttural sounds and rolling on the floor. So Luker decided to move Taylor to cell 7B, an isolation cell that officers use to monitor abnormal behavior. Getting Taylor from the attorney room to 7B required three officers to pick up Taylor and carry him down the hallway. After Taylor was inside 7B but before the officers left the cell, Captain Eric Starr, the jail administrator, came into the hallway to observe Taylor. Though video footage doesn't show inside the cell, it appears that Taylor was still flailing his body and thrashing

2

about because an officer who followed Captain Starr into the hallway rushed into the cell to help the other officers subdue Taylor. Between 8:17 AM (when officers left Taylor's cell) and 8:27 AM, Captain Starr looked into the window of 7B several times to view Taylor.

### B.    Medical Evaluation

Because of his behavior, Luker decided that the medical staff needed to evaluate Taylor. Around 10:18 AM, Luker and other officers brought Taylor to the medical department via restraint chair for an initial health assessment. Video footage shows Taylor flailing his body as the officers worked to handcuff him to the restraint chair. Present for Taylor's health assessment was Heather Clay, an RN, Maggen Cranford, an LPN, and Luker.

According to Clay's progress notes, Taylor couldn't hold an intelligible conversation and would say only that he needed water. Taylor was also flailing his body while restrained in the chair and engaging in manic behavior. Taylor's temperature was 97.9, his pulse was 89, and his oxygen level was 98% but would drop to 88% when he threw his head back to drink water. The nurses couldn't take Taylor's blood pressure because he wouldn't sit still. Clay observed that Taylor was visibly sweating and had a black substance on his lips, back of tongue, and back of throat. Cranford asked Taylor what drugs he had taken and he replied a "blue pill, a small round, oval blue pill." When Cranford asked Taylor where he got the pill, he said he got it from the convenience store and denied shooting up drugs. Taylor also had no visible track marks. Luker then asked Taylor if he had smoked anything. Taylor replied "no." When Cranford again asked Taylor if all he'd taken was a blue, round-oval bill, Taylor replied with wide open eyes and a gaping mouth "Yes! And Bath Salts!" Taylor repeatedly asked for water saying, "My body needs water. I need to feel it going down my throat." But Taylor kept having to be reminded to swallow.

The nurses gave Taylor a water basin to use for a urine sample. Taylor strained for several minutes but couldn't urinate on his own. So Cranford called Brent Cobb, the on-call nurse practitioner, who ordered that Cranford catharize Taylor to get his urine specimen. Taylor's urine was tea colored and tested positive for meth and amphetamines. The medical staff then informed

Luker that Taylor needed to be placed in 7B to be closely monitored. So Luker and three other officers took Taylor back to 7B via restraint chair. Before the officers placed Taylor back in 7B, Cranford told them to give him water and put a jug of water in the cell. Cranford then called Cobb to update him with the results of the urine sample and her observations of Taylor.

### C.   Cell 7B

Taylor would remain in 7B from around 10:58 AM on July 12 until officers discovered that Taylor had passed away around 12:13 AM on July 14. Video footage outside the cell shows Taylor continuously displaying odd behavior. And the video reveals that jail personnel had around 60 encounters with Taylor during his time in 7B. Below, the court focuses on only Defendants' interactions with Taylor.

1. Early checks: At 10:58 AM, Luker looked into the window soon after officers placed Taylor in the cell. Luker again looked into the 7B window around 12:20 PM. Luker next checked in on Taylor around 1:04 PM and remained in the hallway while a male officer looked in the 7B window around 1:07 PM. Luker next looked into the window around 2:45 PM. Captain Starr then looked into the 7B window around 4:34 PM. Around 4:39 PM, Luker looked under the door after the video seems to show a male officer telling her to look at something in Taylor's cell. At 6:55 PM, Luker again observed Taylor through the 7B window. Luker glanced into the window again at 7:20 PM, which would be her last time to observe Taylor.

Johnson's July 12 shift started at 7:00 PM. He first observed Taylor through the 7B window at 8:56 PM. He then looked through the window again at 9:34 PM, 9:45 PM, and 9:49 PM. At 9:55 PM, Johnson opened the cell door, entered Taylor's cell, and talked to Taylor. Johnson completed additional checks of the 7B window at 11:49 PM, 12:53 AM, and 1:04 AM. Blair, who was again working the same shift as Johnson, also looked through the 7B window at 1:09 AM, 1:11 AM, 1:15 AM, and 3:08 AM. At his deposition, Blair said he didn't remember interacting with Taylor, didn't know what caused him to pass away, and didn't know that Taylor was placed in 7B because he had tested positive for methamphetamines. At 5:57 AM on July 13, Johnson had his final encounter with Taylor when he slid Taylor's food tray under his cell.

Dalton Summers and Travis Thornton worked the first shift from 7:00 AM to 7:00 PM on July 13. Thornton first looked at Taylor through the 7B window at 7:31 AM. According to Thornton, he didn't know how long Taylor had been in 7B, but he did note that Taylor was rolling around on a mat and speaking gibberish. Summers first observed Taylor at 8:19 AM. Summers says that he wasn't told that Taylor had tested positive for methamphetamines but knew that inmates got put in 7B for abnormal behavior. At 8:22 AM, Summers and Thornton both looked through the window at Taylor and talked to him. Summers again checked on Taylor at 8:36 AM.

2. <u>Cranford pill pass</u>: Video footage shows Cranford walking down the hall with Summers doing a pill pass around 9:34 AM. Cranford asked to check on Taylor, and Thornton opened the door to 7B to let Cranford see him. Summers, Cranford, and Thornton stood in the doorway interacting with Taylor for around a minute. According to Cranford, when she first looked into 7B, Taylor was laying on his back, had his legs opened wide, and slammed his legs together three times. And when she stepped inside the cell Taylor turned on his stomach, made a feral sound, and then flipped on his back. Cranford's progress notes describe Taylor's breathing as even and unlabored. Her notes also say that she asked Taylor if he was okay, but Taylor was still very manic and couldn't "communicate with real words." So the officers shut the door to Taylor's cell, with Summers pausing to look through the window at Taylor before continuing the pill pass with Cranford.

3. <u>Later checks</u>: Around 9:45 AM and then again at 10:52 AM, a male officer looked under Taylor's door because Taylor kept sticking his hair and hands under the door. At 12:38 PM, Thornton looked through the 7B window and then opened the cell door to deliver Taylor his lunch. At 2:22 PM, Thornton again looked through the 7B window. Thornton would do similar window checks at 2:48 and 3:01 PM. At 3:03 PM, Thornton opened the door to Taylor's cell and spoke to him. Thornton did another window check on Taylor at 4:50 PM. And at 6:10 PM, Thornton had what would be his last interaction with Taylor when he opened the door to 7B, talked to Taylor, and appeared to tell another person who was off camera something about Taylor's behavior.

3. <u>Underwood check</u>: At 6:45 PM, Hadassah Underwood, a Southern Health LPN, looked through the 7B window at Taylor. In progress notes written after Taylor's death, Underwood wrote that Taylor was laying on the floor with his arms stretched above his head, talking, and moving back and forth on the floor. Underwood said Taylor's respiration was unlabored and that he was in no apparent distress.[1]

4. <u>Sergeant Perry</u>: Sergeant Nicholas Perry was the officer in charge of the second shift (7:00 PM to 7:00 AM) on July 13. When Perry started his shift, the day shift officer in charge explained to him that they had an irate man in cell 7B. And when Perry entered the jail, he heard a lot of yelling and cussing that he later learned was coming from Taylor.

At 8:13 PM, Perry opened the door to 7B, partially entered the cell, and talked to Taylor. According to Perry, a coworker of Taylor's had arrived to make bond for Taylor.[2] Perry opened Taylor's cell door to tell him about the bond because—in Perry's experience—combative inmates will often calm down once they realize they are making bond. According to Perry, Taylor was sitting cross-legged on his mat, and when Perry started talking to him, Taylor sprang to his feet and charged at Perry. Perry closed the cell door to avoid a physical altercation and called Captain Starr. Starr, and later Chief Deputy John Garlick, decided that Taylor was too intoxicated to have bonded out. They thought the better plan was to let Taylor remain in the cell and sober up.

Perry told the coworker who came to bond out Taylor that Taylor was intoxicated and that if he was to bond Taylor out, he'd be responsible for Taylor. The coworker responded that although he thought Taylor was a good guy, he did not know him that well, and he did not want to be responsible for him. So Perry took down the coworker's contact information and told him that once

---

[1] Some of the estate's witnesses have suggested that Underwood never checked in on Taylor. But the video footage establishes that Underwood did look through the 7B window around 6:45 PM on July 13.

[2] It's not clear from the video whether Perry's interaction with Taylor about the bond occurred at 8:13 PM or at 9:06 PM, which was Perry's second contact with Taylor. Perry says that Taylor's co-worker arrived at the jail around 9:00 PM, which suggests that Perry told Taylor about the bond at 9:06 PM. But Perry also says that he opened Taylor's cell door to inform him that someone was making bond, and the video shows that Perry opened the door to 7B at 8:13 PM but not 9:06 PM.

Taylor sobered up, he would contact him. At 9:06 PM, Perry looked into the 7B window and again briefly spoke to Taylor.

### D.   Death

Perry left to go to the Anniston City Jail to handle some issues with female inmates housed there and didn't return to the Calhoun County Jail until around midnight. Shortly after Perry arrived back at the Jail, he went to check on Taylor by looking through the 7B window. Taylor was laying down and didn't respond to Perry knocking on the door, so Perry unlocked the cell door. When he opened the cell door, Perry found that Taylor was dead. According to the estate's expert, Dr. Keenon Heard, Taylor probably died sometime between 10:00 PM and 12:00 AM.

### E.   Toxic Delirium

The autopsy report found that Taylor died of methamphetamine toxicity. And according to Dr. Heard, Taylor showed symptoms of toxic delirium from the moment he entered the Calhoun County Jail. The estate's other expert Lori Roscoe, an advanced practice registered nurse, says that Taylor's inability to communicate, use of feral sounds, and failure to answer questions were serious issues that the nursing staff needed to have addressed. And both Dr. Heard and Roscoe agree that prolonged toxic delirium is a medical emergency that should result in treatment at the ER.

## STANDARD OF REVIEW

In reviewing a motion for summary judgment, this court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *See Cuesta v. Sch. Bd. of Miami-Dade Cty.*, 285 F.3d 962, 966 (11th Cir. 2002). Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

The court divides its discussion into two parts. First, the court will address Taylor's deliberate indifference to serious medical need claims under 42 U.S.C. § 1983. Second, the court will address Taylor's state-law claims of negligence, wantonness, and vicarious liability.

## I.     Count One: Deliberate Indifference to Serious Medical Need

The Due Process Clause of the Fourteenth Amendment guarantees pretrial detainees that their serious medical needs will not be met with deliberate indifference. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306 (11th Cir. 2009). To establish a deliberate indifference to serious medical need claim, a plaintiff "must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Id.* at 1306–07.

### A.     Healthcare Provider Defendants

The healthcare provider defendants argue that the deliberate indifference claims against them fail because Taylor wasn't suffering from an objectively serious medical need and none of the Southern Health Partner employees knew Taylor was at a substantial risk of serious harm. The court will address each argument in turn.

1. <u>Serious medical need</u>: "A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 1307 (quotations omitted). Alternatively, "a serious medical need is determined by whether a delay in treating the need worsens the condition." *Id.* Under either test, "the medical need must be one that, if left unattended, poses a substantial risk of serious harm." *Id.*

Taylor wasn't diagnosed by a physician before his death. And the court agrees with the healthcare provider defendants that Taylor's need for medical treatment wasn't so obvious that a lay person would easily recognize it. *See Burnette v. Taylor*, 533 F.3d 1325, 1332 (11th Cir. 2008) (Plaintiff "did not manifest signs of a serious medical need [when] [h]is appearance . . . was consistent with some form of intoxication."); *Johnson v. Bessemer*, 741 F. App'x

694, 700 (11th Cir. 2018) ("medical need was not sufficiently obvious simply because [plaintiff] had taken drugs and was lying on her bed throughout [defendant's] shift."). But under the alternative test, the Eleventh Circuit has held that a plaintiff who died of "excited delirium" caused by methamphetamine use suffered from a serious medical need. *See Mann*, 588 F.3d at 1307. And Dr. Heard, one of the estate's experts, states that had Taylor been treated in an emergency department "his death would more likely than not have been prevented." (Doc. 109-2 at 57). Viewing this evidence in the light most favorable to the estate, a reasonable jury could find that Taylor suffered from a serious medical need.

2. <u>Deliberate indifference</u>: So the court turns to the second element of the deliberate indifference to serious medical need claim. To establish deliberate indifference, a plaintiff must show: (1) subjective knowledge of a risk of serious harm; and (2) disregard of that risk (3) by conduct that is more than mere negligence. *Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1280 (11th Cir. 2017). To be subjectively aware of a risk of harm, an "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. Each individual defendant must be judge separately and on the basis of what that person knew." *Nam Dang*, 871 F.3d at 1280 (cleaned up).

a. *Cobb*: The estate says that Cobb was deliberately indifferent because he didn't order medical monitoring, have the other nurses re-attempt the intake evaluation, or initiate Southern Health's Synthetic Cathinone (Bath Salts) Intoxication/Withdrawal and Alcohol/Drug Withdrawal protocol. According to Roscoe, Cobb, as a nurse practitioner, knew that potential risks to Taylor included dehydration, seizures, and death.

Cobb did agree that meth withdrawal could cause increased heart rate and dehydration. He also said that he'd put an inmate on withdrawal monitoring if there were signs of respiratory distress or vomiting. But based on what Cranford told him, Cobb understood that Taylor was still high on meth, not in withdrawal. And Cobb repeatedly noted that you rarely see withdrawal when it comes to meth. Instead, the person who has taken meth

usually just comes down from their high and sleeps. Cobb also explained that he didn't think it was uncommon for someone who has taken meth to be high and acting erratically for 48 to 72 hours. Nor did Cobb think it uncommon for someone high on meth to be sweating.

Cobb wasn't aware that Taylor was at a substantial risk of serious harm. Taylor tested positive for methamphetamines, not bath salts, so it was reasonable for Cobb to assume that Taylor's behavior was based on methamphetamine intoxication. And Cobb didn't find Taylor's behavior uncommon for someone high on meth. Cobb also didn't think Taylor needed to be put on withdrawal monitoring because there were no signs of respiratory distress/vomiting and he had rarely seen withdrawal from meth. To be sure, Roscoe says that someone with Cobb's education level should have known the potential risks to someone in Taylor's condition. But Roscoe didn't explain why Cobb's training would put him on notice that Taylor was at a serious risk of harm. And no matter what he knew about the dangers of methamphetamine toxicity or toxic delirium, there's no evidence that Cobb ever inferred that Taylor's condition required medical care or closer monitoring.

Indeed, "[n]o liability arises under the Constitution for an official's failure to alleviate a significant risk that he should have perceived but did not." *Burnette*, 533 F.3d at 1331 (quotations omitted). And "failure to follow procedures does not, by itself, rise to the level of deliberate indifference because doing so is at most a form of negligence." *Taylor v. Adams*, 221 F.3d 1254, 1259 (11th Cir. 2000). Because Cobb didn't intentionally refuse to provide medical care that he suspected Taylor needed, the court finds that he wasn't deliberately indifferent to Taylor's serious medical needs.

*b. Clay*: Clay, like Cobb, participated in only Taylor's initial evaluation. The estate says that she was deliberately indifferent by not placing Taylor under medical observation and monitoring. According to the estate, proper medical monitoring would have required the nurses to attempt to take Taylor's vital signs and to conduct a physical assessment at least twice a shift. It also would require them to call Cobb with updates on Taylor's condition. The estate also faults Clay for not telling the jailers what conditions to monitor for when Taylor was in 7B.

Based on her training, Clay knew that methamphetamine intoxication could cause hyperactivity, sweating, an elevated heart rate, and bizarre behavior. And Clay agreed that an elevated temperature, elevated heart rate, and dehydration could be signs of a serious medical condition. But Clay, like Cobb, said that she typically didn't see withdrawal symptoms from meth. Nor was Taylor exhibiting withdrawal symptoms when Clay saw him. Clay instead viewed Taylor as "your typical inmate high on meth." (Doc. 109-1 at 12). So Clay saw no need to place Taylor in the withdrawal monitoring protocol.

During Taylor's physical assessment with Clay, his temperature was 97.9, his pulse was 89, and his oxygen level was 98% (though it would drop to 88% when he threw his head back to drink water). And while Taylor was behaving bizarrely and struggling to communicate, Clay didn't think that was unusual for someone on meth. Nor did she think that Taylor's intoxication required placing him on medical monitoring. And Clay believed that the jailers would make the nursing staff aware of any changes in Taylor's condition that suggested he required medical attention.

The evidence fails to show that Clay knew that Taylor was at a substantial risk of serious harm. "The Constitution does not require an arresting police officer or jail official to seek medical attention for every arrestee or inmate who appears to be affected by drugs or alcohol." *Burnette*, 533 F.3d at 1333. And the record reflects that while Clay knew that Taylor was under the influence of methamphetamine, she didn't suspect that he was at serious risk of developing methamphetamine toxicity. Nor did she understand that Taylor was exhibiting symptoms of toxic delirium that required medical treatment. So Clay wasn't deliberately indifferent.

*c. Cranford*: Cranford participated in Taylor's initial evaluation and observed Taylor in his cell about 24-hours after the evaluation. The estate says that Cranford also should have placed Taylor under medical monitoring or observation and informed the jailers about changes in Taylor's condition that they should look out for. The estate also alleges that Cranford was deliberately indifferent when she observed Taylor being manic and making feral noises around 24 hours after the initial evaluation. According to the estate, after her medpass, Cranford should have again attempted to obtain Taylor's vital signs, completed her physical evaluation, and further updated Cobb on Taylor.

11

Cranford acknowledges that she knows that methamphetamine intoxication can kill you. And Cranford would send someone intoxicated from methamphetamine to the emergency room if she thought he was in distress because of his breathing and heart rate. But she says that during Taylor's evaluation he was exhibiting typical behavior for a meth addict and was under no distress. For example, she read Taylor's vital signs as showing that he had a normal heart rate, normal O2, and no trouble breathing. So Cranford believed Taylor needed to just come off his high. And Cranford said that she understood it could take up to a week for a person to come off a meth high depending on how much methamphetamine that person had consumed.

When Cranford entered Taylor's cell during her medpass, he was still very manic and couldn't communicate with real words. And Taylor slammed his legs together, turned onto his abdomen, and made feral sounds at Cranford. But Cranford thought that Taylor was calmer than he was the day before. Cranford also observed that Taylor's breathing was even and unlabored.

Though Cranford knew that methamphetamine intoxication can be lethal, the record reflects that she never suspected that Taylor was at risk of overdosing. And based on her observations of Taylor, Cranford didn't think that Taylor's condition required further investigation or monitoring. So Cranford didn't know that Taylor was at a substantial risk of serious harm. *See Jones v. Dr. Steve Anderson, Behav. Med., LLC*, 767 F. App'x 701, 705 (11th Cir. 2019) (Nurse not deliberately indifferent when she didn't know discontinuing Subsutex could cause withdrawal syndrome, so she failed to administer medication, which led to arrestee's death.).

*d. Underwood*: Underwood observed Taylor through the 7B window around 6:45 PM. When Underwood saw Taylor, he was laying on the floor with his arms stretched above his head, babbling, and moving back and forth on the floor. Underwood believed that Taylor's breathing was unlabored and that he was in no apparent distress. According to the estate, Underwood should have physically evaluated Taylor or obtained his vital signs because he was babbling and couldn't communicate. And the estate says that Underwood also needed to report Taylor's behavior to Cobb.

Underwood says that she wasn't aware of the adverse side effects for someone intoxicated on methamphetamine. And she didn't know of a withdrawal protocol for those high on meth, so she felt that there was nothing that the nurses could do for someone who tested positive for methamphetamines. Plus, Underwood said that while she knew Taylor tested positive for methamphetamine, his vital signs were within normal limits. The record thus reflects that Underwood wasn't aware that Taylor faced a substantial risk of serious harm if she failed to assess whether he needed medical attention or report his condition to Cobb. *See id.*

*e. Southern Health*: The estate's deliberate indifference claims against Southern Health are derivative of the claims against Cobb, Clay, Cranford, and Underwood. Because the deliberate indifference claims against each nurse fails, the deliberate indifference claims against Southern Health also fail.

## B.     Law Enforcement Defendants

The law enforcement defendants argue that they also lacked subjective knowledge of a serious risk of harm to Taylor.[3] On top of that, they assert the defense of qualified immunity. Qualified immunity protects government officials from being sued in their individual capacities so long as "their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vineyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Eleventh Circuit applies a two-part test to determine whether a government official is entitled to the defense of qualified immunity. "First, the official must prove that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. Second, if the official meets that burden, the plaintiff must prove that the official's conduct violated clearly established law." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998) (citations omitted).

---

[3] The estate concedes that the claims against Graham and Hall should be dismissed. And the estate agrees to the dismissal of the supervisory claims against Starr. So the court needn't address these claims any further.

No one disputes that the law enforcement defendants were acting within the scope of their discretionary authority. So the burden is on the estate to show that these defendants violated Taylor's clearly established rights.

1. <u>Constitutional violation</u>: The estate says that after observing Taylor's abnormal behavior for over 24 hours the law enforcement defendants should have requested a medical check. The estate also says that Taylor's prolonged toxic delirium was a medical emergency that require the jailers to transfer Taylor to a medical facility. And the estate notes that Jail policy states that "[i]f [an] inmate is in close confinement for behavior observation or because he/she is intoxicated, staff observation will be at least every 15 minutes." (Doc. 104-25 at 80). But jail staff would sometimes go hours without checking on Taylor. Keeping in mind that "[e]ach individual defendant must be judged separately," *Nam Dang*, 871 F.3d at 1280, the court addresses below what the individual defendants knew about Taylor.

*a. Johnson*: Johnson was the booking officer when Nolan arrived with Taylor at the Calhoun County Jail. Johnson says that Taylor was sweaty and mumbling something that wasn't coherent. But Taylor seemed to understand what the officers were saying and was compliant. Because of Taylor's condition, Johnson assumed that he was being charged with public intoxication, but he didn't know any other details about Taylor.

Video footage suggests that Johnson had around 9 encounters with Taylor in Cell 7B. Johnson wasn't there when Taylor got placed in 7B but assumed that Taylor was there because of the behavior Johnson observed the day before. Though Johnson doesn't remember his interactions with Taylor when Taylor was in 7B, the video shows that Taylor was sticking his shoes, hands, and other items under the 7B door around the times Johnson was near the cell.

*b. Luker*: When Luker first encountered Taylor he was in the attorney room and acting strange and combative. Luker said that Taylor was making noises, but you couldn't understand what he was saying. So Luker decided to have Taylor evaluated by the medical staff. After Taylor's medical evaluation, Luker knew that Taylor had tested positive for several illegal substances and

that the medical staff agreed with her that Taylor should remain in 7B to be closely monitored.

Luker remembers that Taylor was sweating but didn't notice the black substance around his lips and tongue. And during her several contacts with Taylor while he was in 7B, Luker says she mainly just observed Taylor yelling.

*c. Blair, Summers, & Thornton*: Blair, Summers, and Thornton had more limited contact with Taylor than Luker. Blair assisted Nolan and Johnson in placing Taylor in the attorney room when he first arrived at the Jail. And video footage shows Blair interacting with Taylor four times during his July 13 shift. Blair doesn't remember interacting with Taylor, didn't know what caused Taylor to pass away, and didn't know that Taylor was placed in 7B because he had tested positive for methamphetamines. And you cannot tell from the video what Taylor was doing when Blair looked in the 7B window.

Summers interacted with Taylor four times on the morning of July 13. But he doesn't remember any of those interactions and says he didn't know that Taylor had been charged with public intoxication or tested positive for methamphetamines. Video footage shows Summers looking in Taylor's direction at 8:49 AM when Taylor had his hand sticking out from under the door to 7B. And Summers was present when Cranford had the officers open the cell door to check on Taylor around 9:34 AM.

Thornton encountered Taylor around 12 times during his July 13 shift. But he says that he recalls only one interaction with Taylor. During that encounter, Thornton looked through the window and saw Taylor rolling around and speaking gibberish. But Thornton didn't know how long Taylor had been in 7B or that he'd tested positive for methamphetamines. Thornton also observed Taylor slamming his legs together, turning onto his abdomen, and making feral sounds at Cranford. And each time Thornton opened the door to Taylor's cell, he could see that Taylor had pushed his mat and other items up against the cell door. Plus, during Thornton's last interaction with Taylor, he opened the door to 7B, talked to Taylor, and appeared to tell another person who was off camera something about Taylor's behavior

*d. Starr*: Starr was in his office when he heard Taylor yelling and came to check on him. Taylor was cursing but also speaking incoherently. So Starr

says he and Luker decided to take Taylor to medical for an assessment. Taylor returned to 7B where Starr could hear him yelling from time-to-time from his office. Starr next received an update on Taylor when Perry told him that someone was there to bond out Taylor but that Taylor was still under the influence and confrontational. Starr decided that because of his level of intoxication Taylor couldn't be released. So Starr instructed Perry to inform Taylor's coworker that he'd be responsible for Taylor once released.

   *e. Perry*: Perry was the last officer to encounter Taylor. At the start of Perry's shift, the officer in charge of the day shift told him that there was a very irate man in 7B. Perry understood that Taylor was both under the influence of methamphetamine and combative. And when Perry entered the jail, he heard a lot of yelling and cussing that he later learned was coming from Taylor. Every time Perry went around Taylor he was screaming, cussing, and mad at the world.

   After Taylor's coworker came to bond him out, Perry opened Taylor's cell door to let Taylor know that someone was making bond. Taylor was sitting cross-legged on his mat and sprang to his feet to charge at Perry, which caused Perry to close the cell door. Perry then called Captain Starr and was instructed to tell the coworker that Taylor was intoxicated and that the coworker would be responsible for Taylor's actions if he made bond for him. Perry says that he never thought Taylor was in any medical distress and that he didn't observe Taylor having trouble breathing or experiencing any seizures. So Perry didn't see the need to contact medical personnel about Taylor's behavior. When Perry returned to the Jail around midnight, he noticed that Taylor was no longer yelling or cursing. So Perry went to check on Taylor and found him dead.

—

   Even viewing this evidence in the light most favorable to the estate, the law enforcement defendants weren't subjectively aware of a risk of harm to Taylor. Again, "[t]he Constitution does not require an arresting police officer or jail official to seek medical attention for every arrestee or inmate who appears to be affected by drugs or alcohol." *Burnette*, 533 F.3d at 1333. And none of the law enforcement defendants' testimony suggests that they thought

16

Taylor was ever in medical distress. They merely thought that Taylor was behaving bizarrely because he was high.

The estate points out that its experts have testified that Taylor wasn't acting like a typical person high on methamphetamines and was instead exhibiting symptoms of toxic delirium. And defense expert Lisa Meaker said that at her facility most people high on meth are, unlike Taylor, housed in general population. But as discussed, "an official's failure to alleviate a significant risk that he should have perceived but did not" doesn't give rise to a deliberate indifference claim. *See Burnette*, 533 F.3d at 1331 (quotations omitted). And the record fails to establish that any of the law enforcement defendants understood that Taylor's behaviors were symptoms of toxic delirium that left untreated could result in methamphetamine toxicity. There isn't, for example, evidence that these jailers had encountered an inmate behaving this way who later overdosed. *See Farmer*, 511 U.S. at 842 (explaining that one way plaintiff establishes circumstantial evidence of deliberate indifference is if risk of harm "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past"). So the record doesn't show that the law enforcement defendants knew there was a substantial risk of harm in not obtaining medical care for Taylor or more closely monitoring him. And without this subjective knowledge of a risk of harm, the failure to follow the 15-minute monitoring procedure was at most negligent. *See Taylor*, 221 F.3d at 1259.

In addition, after Taylor's medical assessment, the nurses didn't place Taylor on a medical watch or tell Luker to do anything besides closely monitor Taylor. And the estate hasn't presented evidence that Taylor's condition "was so obviously dire" that the law enforcement defendants knew they needed to overrule the nurses and obtain medical care for Taylor. *See Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1159 (11th Cir. 2010). Nor is there evidence that the law enforcement defendants ever understood that Taylor's condition had worsened and become a medical emergency. So the law enforcement defendants weren't deliberately indifferent. *See id.*

2. <u>Clearly established law</u>: Even if the court were wrong about whether the estate has stated a constitutional violation against the law enforcement defendants, the estate would still need to show that the constitutional violation

was clearly established. Violation of a constitutional right is clearly established in one of three ways: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement or principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009). "This analysis is primarily conducted by looking at the binding case law of the Supreme Court and this circuit." *Charles v. Johnson*, 18 F.4th 686, 698 (11th Cir. 2021).

The two most relevant published Eleventh Circuit cases favor the law enforcement defendants. For example, in *Burnette v. Taylor*, 533 F.3d 1325, 1332 (11th Cir. 2008), the court affirmed summary judgment for a jailer who didn't obtain medical care for an arrestee he knew possessed a pill bottle when arrested, had slurred speech, and needed help walking. In affirming summary judgment, the court noted that though the decedent's condition "was consistent with some form of intoxication," he "did not manifest signs of a serious medical need." *Id.* And the court cited with approval a case from the Eighth Circuit affirming summary judgment when the arresting officer and jailers knew the plaintiff was likely under the influence of methamphetamine. *Id.* at 1333.

In *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291 (11th Cir. 2009), the court affirmed summary judgment for two officers in a case in which an arrestee died from excited delirium after ingesting methamphetamine. In that case, the arrestee's family told the deputies that the arrestee was sick and needed go to the hospital, the deputies knew of her methamphetamine use, and one of the deputies reported to EMS that the arrestee was "acting 'crazy.'" *See id.* at 1307. But the deputies "had no knowledge of the medical condition called 'excited delirium' or its accompanying risk of death." *Id.* And the arrestee's behavior suggested to both the officers and EMS only that she was agitated and having "a temporary reaction to the known use of methamphetamine." *Id.* at 1308. So the court found that the officers weren't deliberately indifferent.

The estate says that this is an obvious case in which the existence of directly on point caselaw isn't necessary to overcome the law enforcement defendants' qualified immunity defense. But "if a plaintiff relies on a general rule," for example, that officers cannot be deliberately indifferent to the serious

medical needs of pretrial detainees, "it must be obvious that the general rule applies to the specific situation in question." *Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010). "Minor variations between cases may prove critical." *Id.* Given the caselaw discussed above, the court finds that it isn't obvious that the law enforcement defendants violated Taylor's right to be free of deliberate indifference to his serious medical needs. So the court finds that the law enforcement defendants are entitled to qualified immunity.

## II.   State Law Claims

The remaining claims of negligence, wantonness, and vicarious liability all arise under state law. And this court doesn't have original jurisdiction over these claims (*see* doc. 53 ¶ 2), so the court has discretion whether to exercise supplemental jurisdiction over them. *See Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004).

The Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." *Id.* at 1089. The court feels particularly encouraged here because whether the estate has stated viable claims of negligence and wantonness against the law enforcement defendants likely turns on 2019 amendments to the Alabama code that the Alabama appellate courts have yet to interpret. (*See* Doc. 113 at 35–39). These state law issues are best left for state courts to decide. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726–27 (1966). So the court will dismiss Taylor's state-law claims without prejudice.

### CONCLUSION

For the reasons stated above, the court will **GRANT** the healthcare provider defendants' motion for partial summary judgment (doc. 107) and **GRANT IN PART** the law enforcement defendants' motion for summary judgment (doc. 102).

The court will **DISMISS WITH PREJUDICE** the deliberate indifference to serious medical needs claims brought under 42 U.S.C. § 1983. The court will decline to continue to exercise supplemental jurisdiction over the state-law claims and **DISMISS** those claims **WITHOUT PREJUDICE** under 28 U.S.C. § 1367(c).

The court will enter a separate final order that closes this case.

**Done** on June 12, 2023.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE